Alvin Ernest SCOTT

v.

**CRESCENT TOOL COMPANY, DIVISION OF CRESCENT NIAGARA CORPORATION, Defendant and Third-Party Plaintiff,**

v.

**John Archie WALKER, Third-Party Defendant and Fourth-Party Plaintiff,**

v.

**FRUEHAUF CORPORATION, Fourth-Party Defendant.**

Civ. A. No. 11974.

United States District Court
N. D. Georgia,
Atlanta Division.

Dec. 27, 1968.

Addendum to Order Jan. 15, 1969.

Carnes, Dillon & White, Atlanta, Ga., for plaintiff.

Greene, Buckley, DeRieux, Moore & Jones, Atlanta, Ga., for Crescent Tool Co.

McCord, Cooper & Voyles, Hapeville, Ga., for John Archie Walker.

Gambrell, Russell, Moye & Killorin, Atlanta, Ga., for Fruehauf Corp.

**EDENFIELD, District Judge.**

The court is presented with a motion by the defendant, Crescent Tool Company, an out-of-state corporation, to quash service of process against it.[1]

Plaintiff, an employee of Fruehauf Trailers of Atlanta, states that he used Crescent's metal punch on October 17, 1967, to remove a pin from a trailer brake shoe. Plaintiff contends that the punch was new and that he was using it for the purpose for which it was made. Plaintiff gave the large end of the punch several blows with a hammer, when the small end of the punch shattered and a piece allegedly hit plaintiff's left eye, lacerating his cornea and permanently limiting his vision as to projection and perception. Because his right eye was of limited, if any, usefulness prior to the accident, he has suffered a total loss of income now, with a 75% prospective loss of earning power in the future. Plaintiff also sues for pain, suffering, and expenses. He asks for $200,000 plus costs. Plaintiff contends that defendant's negligent design and manufacture of the punch was the proximate cause of the injury. Crescent, as a third-party plaintiff, sued plaintiff's immediate superior, Walker, who, in turn, filed a motion to dismiss the third-party action against him on the ground that it was barred by the Georgia Workmen's Compensation Act. Walker filed a complaint as a fourth-party plaintiff against Fruehauf Company, Scott's employer.

Scott, a resident of Atlanta, Georgia, was injured in Fulton County, Georgia. Defendant Crescent is a New York corporation, all of whose officers and directors are residents of the State of New York. Third-party defendant Walker is a resident of Fulton County, Georgia; and fourth-party defendant Fruehauf is a Michigan corporation which does business in Georgia, and has an office and an agent for service in Atlanta. Defendant was served with notice by publication. There is no contention that defendant did not receive adequate notice.

Crescent's motion to quash service is based on two grounds. First, Crescent contends that Georgia Code § 24–113.1 the "long-arm" jurisdictional statute, is unconstitutional as a violation of Article VI, Section XIV, Paragraph VI, of the Georgia Constitution. This constitutional provision establishes venue for all civil action "in the county where the defendant resides", except in cases enumerated in other constitutional provisions. Defendant argues that it does not reside in Georgia, that § 24–113.1 does not establish a "residence" for the defendant, and that the place of commission of a tort does not establish the actor's residence. Next, defendant urges that § 24–113.1 does not apply because it neither transacted business in Georgia, within the meaning of § 24–113.1 (a), nor committed a tortious act within the State, under § 24–113.1(b).

For reasons stated herein, the court finds no merit to either contention and therefore denies defendant's motion to quash service.

## I. § 24–113.1 CONSTITUTIONAL UNDER GEORGIA CONSTITUTION

Georgia Code § 24–113.1 does not conflict with Article VI, Section XIV, Paragraph VI, of the Georgia Constitution. Paragraph VI is a venue provision which defines the location of suits in state court. On the other hand, § 24–113 does not deal with the county of suit, but with when personal jurisdiction

---

1. Defendant styled its motion as one to dismiss for improper venue. However, the briefs of both parties concern service of process, not venue. The court has been informed as of December 20, 1968, by Mr. White for plaintiff and Mr. Eichelberger for defendant that the motion should be treated as one to quash service.

may be secured over nonresidents. Georgia Code § 24–116 is the venue provision accompanying § 24–113. Section 24–116 in effect defines Paragraph VI residence for the "long-arm statute" as the county where business is transacted, a tort occurs, or where real property is located. Even as to § 24–116, whose constitutionality is not in question, there are no constitutional difficulties. Section 24–116 is merely an elaboration of residence in Paragraph VI of the Georgia Constitution.

## II.  STATE, NOT FEDERAL, LAW APPLIES

Next, the defendant contends it does not fall within the requirements for jurisdiction enumerated in § 24–113.1 and thus could not validly be served with process. In order for § 24–113.1 to apply, Crescent had to fit within § 24–113.1(a) or § 24–113(b).[2]

Section 24–113.1(a) states that:

"A court of this State may exercise personal jurisdiction over any nonresident, or his executor or administrator, as to cause of action arising from any of the acts, ownership, use or possession enumerated in this section, in the same manner as if he were a resident of the State, if in person or through an agent, he

"(a) transacts any business within this State · * * *."

Defendant contends that it does not transact any business within Georgia and that "doing business" in this State has been interpreted more restrictively than the United States Supreme Court would constitutionally permit. McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). While this court agrees with defendant that § 24–113.1(a) is not applicable to the instant case, it comes to that conclusion through a different set of principles than those urged on it by the defendant. Because of the importance of this case to the applicability of Georgia's

new long-arm statute, which has as yet not been interpreted, a thorough discussion of the issues involved is necessary.

A threshold question is whether amenability of nonresident corporations to service of process under long-arm statutes is determined with reference to state or federal law, in diversity cases before federal courts. This has provoked a continuing controversy.

Rule 4(d)(3) of the Federal Rules of Civil Procedure provides the manner in which service is made on a corporation. Rule 4(d)(7) and Rule 4(e) of the Federal Rules provide that it is proper to serve corporations in the manner prescribed by the law of the state in which the federal District Court is held. Much of the controversy surrounding the applicability of federal versus state law concerns whether Rule 4 of the Federal Rules establishes a federal standard not only for manner of service but for amenability to service—that is, for jurisdiction to be served. If a federal standard is provided, then federal courts in diversity suits should apply federal law to determine amenability under § 24–113.1. However, if Rule 4 enunciates no congressional mandate, state law should apply.

The United States Court of Appeals for the Second Circuit grappled with this problem on two occasions. Initially, in Jaftex Corp. v. Randolph Mills, Inc., 282 F.2d 508 (2d Cir., 1960), Judge Clark held for the Second Circuit that:

"* * * [T]he question whether a foreign corporation is *present* within a district to permit service of process upon it is one of the federal law governing the procedure of the United States and is to be·determined accordingly."

In effect, the Court held that only the outer reaches of federal due process limited a state in imposing jurisdiction on foreign corporations.

---

2.  Section 24–113.1(c) is clearly inapposite in this case, for it applies only to a defendant who "owns, uses, or possesses any real property within this State."

Prior to enunciation of the *Erie* doctrine, Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487 (1938), amenability of an out-of-state corporation to jurisdiction was clearly a matter of federal law, in diversity cases in federal court, upon which the federal courts exercised an independent judgment. See, e. g., Southern Pacific Co. v. Denton, 146 U.S. 202, 13 S.Ct. 44, 36 L.Ed. 942 (1892). *Jaftex*, supra, was thus a post-*Erie* application of a doctrine widely held prior to *Erie*.

Legal authorities have argued over the effect of *Erie* on the question. Many have concluded that *Jaftex*, supra, is sound despite *Erie's* requirement that federal courts look to state law in diversity cases, when questions of substantive law are involved. It has been urged that for federal courts to apply state law in determining personal jurisdiction in federal diversity cases would prove troublesome under the "bulge rule" of Rule 4(f) of the Federal Rules as well as in cases when plaintiff's actions contain a federal and a non-federal claim. It is also argued that the application of varying state laws would undermine federal uniformity. See 2 Moore, Federal Practice, ¶ 4.25[7], at 1182–1183.

However, the legal pendulum has swung the other way. In 1963, the Second Circuit, per Friendly, J., overruled the *Jaftex* decision, in Arrowsmith v. United Press International, 320 F.2d 219 (2d Cir. 1963). In that case, plaintiff, a Maryland resident, brought suit for libel against UPI, a New York corporation, in a federal district court in Vermont, alleging diversity of citizenship. Service was made on the local UPI manager under Rule 4(d) (3) of the Federal Rules. UPI moved to dismiss, alleging a lack of personal jurisdiction

for purposes of process. The Second Circuit found no mandate for a federal standard in Rule 4(d) (3), which it stated prescribed only the mechanics of serving process, not amenability to jurisdiction. Accordingly, the court held that the issue of amenability must be determined in accordance with the law of the state where the federal court sat. Federal law was relevant only to decide if the state's assertion of jurisdiction was constitutional under the Fourteenth Amendment. Although the court agreed that Congress *could* give the federal courts, if it wished, a broader jurisdiction in diversity cases than the limit established by the states, no federal policy was found to override valid state amenability laws.[3] The Court concluded that in diversity cases, absent a congressional standard:

"State statutes determining what foreign corporations may be sued, for what, and by whom, are not mere whimsy; like most legislations, they represent a balancing of various considerations—for example, affording a forum for wrongs connected with the state and conveniencing resident plaintiffs, while avoiding the discouragement of activity within the state by foreign corporations. We see nothing in the concept of diversity jurisdiction that should lead us to read into the governing statutes a congressional mandate, unexpressed by Congress itself, to disregard the balance thus struck by the states." 320 F.2d at 226.

■ The *Arrowsmith* doctrine has become predominant. Jennings v. McCall Corp., 320 F.2d 64 (8th Cir., 1963); Walker v. General Features Corp., 319 F.2d 583 (10th Cir., 1963); Smartt v. Coca-Cola Bottling Corp., 318 F.2d 447 (6th Cir., 1963). See also, Kaplan, Federal Rules Amendments, 77 H.L.R. 601,

3. It appears from the record that service was made in the instant case pursuant to Rule 4(d) (7), although this is nowhere stated. Most of the cases holding that state law governs amenability to service of process have arisen under Rule 4(d) (7). 2 Moore, Federal Practice, ¶ 4.25 [7], at 1179, n. 10. In Arrowsmith, the court arrived at the same conclusion under Rule 4(d) (3). There no longer seems to be a distinction between the two for purposes of applying state law.

629–632 (1964). This court is controlled by the decision of the Fifth Circuit which decided, in accord with the above Circuits, that in determining the validity of service in diversity cases, the federal law must apply the law of the forum state, if the state law does not violate federal due process. Woodham v. Northwestern Steel & Wire Co., 390 F.2d 27 (5th Cir., 1968). For further discussion see Wright, Federal Courts, Ch. 10, § 64.

### III. APPLICABILITY OF STATE LAW TO FACTS

Defendant contends that since state law applies, this court must recognize that "doing business" in Georgia is more restrictively interpreted than federal law would permit under McGee v. International Life, supra. Defendant further contends that the restrictive definition of "doing business" applies to "transacts any business" in § 24–113.1(a), since the two phrases are meant to be identical. The court finds no merit to this contention. Defendant cites Buckhead Doctors' Building, Inc. v. Oxford Finance Companies, Inc., et al., 115 Ga.App. 52, 153 S.E.2d 650 (1967), to prove its point. But the *Buckhead* case was decided under Georgia Code § 22–1507, not under § 24–113.1(a). The former is an implied consent provision permitting service of process on a foreign corporation by service on the Georgia Secretary of State, if it

> "shall do business in this State or * * * shall do any act in this State while doing business herein which may subject it to liability to any person."

■ The court in *Buckhead* pointed out that prior to enactment of this 1946 provision, Georgia courts had given a restrictive definition to "doing business". The court reasoned that if the Georgia legislature had wished to enlarge this definition, it would have used different and more expansive language in § 22–1507, than merely "doing business". Section 24–113.1(a), enacted twenty years later, uses the term "transacts any business". Since there are no Georgia cases interpreting this new lan-

guage, this court must try to interpret the language as would a Georgia state court. Both by clear language and purpose, this language should be interpreted more expansively than "doing business" in § 22–1507. Haas v. Fancher Furniture Co., 156 F.Supp. 564, 567 (N.D.Ill. 1957). The very purpose of the long-arm statute is to protect Georgia citizens from the perils of modern commercial practice, by giving an expansive definition to the amount of "business" necessary to secure jurisdiction. The legislature could have hardly used more emphatic language than "any business" to indicate their intent to move beyond the narrow "doing business" concepts of § 22–1507. Nor should the change in phraseology be thought merely fortuitous. By the time this long-arm statute was enacted, the "doing business" notion had become an anachronism, replaced, as we shall see in more detail later, by more sophisticated concepts. See International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057 (1945). We should not presume that the Georgia legislature would use the language it employed only to have the courts interpret it as synonymous with an outmoded phrase, "doing business".

■ Despite all of this, the court stops short of holding that the defendant's conduct places it within § 24–113.1 (a). In so doing, the court does not decide that defendant's business contacts with the State are insufficient to merit application of subsection (a). Rather, the court concludes that the plaintiff's cause of action *does not arise from* the transaction of any business, as § 24–113.1(a) requires. The court holds that § 24–113.1(a) applies to matters in contract, not to those sounding in tort. The court means by this to make no overly formal distinctions, but rather to get to the heart of the statute's purpose. Other courts have so construed almost identical statutes; see, for example, Ill.Rev.Stat. (1957), Ch. 110, ¶¶ 16 and 17, construed in Hellriegel v. Sears, Roebuck & Co., 157 F.Supp. 718 (N.D.Ill., 1957); Haas v.

Fancher Furniture Co., supra. The Georgia legislature could have defined transactions of business as including both contractual and tortious actions, as other states have done. See, e. g., Vernon, Ann.Civ.St.Tex. art. 2031b, § 4. But they chose not to do so. By including tortious action under a separate subsection, § 24–113.1(b), the legislature could not have meant for a cause of action in tort to arise from the transaction of business, under § 24–113.1(a) as well. Otherwise, § 24–113.1(b) would have been redundant and unnecessary. As a matter of federal due process, Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), makes it clear that if there are substantial contacts between a foreign corporation and the forum state, jurisdiction could lie in the forum state, even though the cause of action arises from activities entirely distinct from the forum state. As the Supreme Court of the United States pointed out in *Perkins*, the essential issue is fairness to the corporate defendant, and the place in which the cause of action arises is merely one element in the total calculus. But what is constitutionally permissible under the Fourteenth Amendment need not be enacted by the states. In fact, as the Supreme Court recognized in *Perkins*, there was no compulsion on Ohio, the forum state, to open its courts to causes of action not arising from in-state activities. 342 U.S. 437, 445–446, 72 S.Ct. 413, 96 L.Ed. 485. As Georgia has done here, states may enact jurisdictional statutes which require the cause of action to arise from the transaction of business within the state. Federal courts in diversity suits must follow these statutes, under the *Arrowsmith* principle, supra. In addition, *Perkins*, supra, dealt only with the *location* of the activity giving rise to the cause of action, while § 24–113.1(a) discusses the *type* of activity—contract, not tort. Thus the *Perkins* rule is not applicable here. Since the accident to the plaintiff did not arise from the transaction of business in Georgia, but rather

arises from tort, there is no jurisdiction under § 24–113.1(a) in this case.

## IV. TORTIOUS CONDUCT WITHIN GEORGIA 24–113.1(b)

Under § 24–113.1(b):

"A court of this State may exercise personal jurisdiction over any nonresident, or his executor or administrator, as to cause of action arising from any of the acts, ownership, use or possession enumerated in this section, in the same manner as if he were a resident of the State, if in person or through an agent, he

\* \* \* \* \* \*

"(b) Commits a tortious act within this State, except as to a cause of action for defamation of character arising from the act \* \* \*."

█ The validity of service under state long-arm statutes such as Georgia's depends upon an act contemplated by the statute and sufficient contact with the forum state by the defendant to satisfy due process. But as Professor Moore explains:

"Some decisions hold that the commission of the act itself satisfies the *minimum contacts* requirements of due process; others hold that, in addition to the commission of act, there must also be sufficient minimum contacts present. \* \* \* There may be situations where the defendant has had sufficient contact with the state to satisfy the requirements of due process, yet the act on which service is based is not one contemplated by the statute as it has been interpreted. Conversely, though the defendant has done an act contemplated by the statute, some courts hold that nevertheless he has not had sufficient contact with the state to satisfy the requirements of due process. Some solitary acts are held sufficiently to impinge upon the state so that upon commission the actor is subject to jurisdiction, if the statute so provides. In other contexts, a lone act does not suffice." 2

Moore, Federal Practice, ¶ 4.41–1[3], at 1291.56.

Here again, as with § 24–113.1(a), this court is without benefit of a state court interpretation of the requirements for service, and will decide the case as a state court might have.

The court need not decide here if a solitary tort, without more, would be sufficient to secure jurisdiction over Crescent under subsection (b). There are indications that it might be constitutionally permissible, McGee v. International Life, supra; Smyth v. Twin State Improvement Corp., 116 Vt. 569, 80 A.2d 664, 25 A.L.R.2d 1193 (1951). But in the instant case there are sufficient additional contacts to clearly put the case within the ambit of § 24–113.1 (b), without dependency on the single-tort theory, and to make service pursuant to the subsection constitutional.

■ Historically, a corporation has always been subject to suit in the state of its incorporation, but a judgment in personam against a nonresident corporation was violative of due process, absent a personal appearance or personal service of process in the forum state. Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565 (1877). But such a doctrine could not long persist with the changing world of corporate enterprise. As corporations began doing large-scale multi-state businesses, fictions were created by the courts to permit service of process. Initially, the "implied consent" theory arose, based on the fiction that because a foreign corporation did business in the forum state, it implicitly submitted itself to the jurisdiction of the forum state's courts. Lafayette Ins. Co. v. French, 18 How. 404, 15 L.Ed. 451 (1856); Ex parte Schollenberger, 96 U.S. 369, 24 L.Ed. 853 (1877). Somewhat later, the "presence" theory was created, under which a foreign corporation was deemed amenable to process if it did business "within the state in such manner and to such extent as to warrant the inference that it is present there." Philadelphia & Reading Ry. Co. v. McKibben, 243 U.S. 264, 265,

37 S.Ct. 280, 61 L.Ed. 710 (1917). Out of the "consent" and "presence" theories the "doing business" test was developed. In this test, "the determinant was whether the foreign corporation was doing sufficient business to justify subjecting the corporation to the jurisdiction of the forum." 2 Moore, Federal Practice, ¶ 4.25[2.–1], at 1150.

The modern concept, which has largely replaced the "doing business", "presence", and "consent" tests, is the "minimum contact" test, first enunciated in International Shoe v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057 (1945). There the Supreme Court abandoned the other fictions and determined that jurisdiction over a foreign corporation could be found if the corporation had such "minimum contacts" with the forum state as "not to offend traditional notions of fair play and substantial justice." The minimum contacts with the forum state, Washington, in *International Shoe* were that defendant's salesmen resided, worked, and were paid according to sales there, and they received samples from the defendant, which were exhibited in Washington. However, the salesmen's authority was limited to exhibiting their samples and soliciting orders from prospective buyers at prices and on terms fixed by the defendant. No salesman could make collections or enter into contracts. Defendant had no office in the forum state, maintained no stock there, and made no contracts either for sale or purchase of merchandise there. Yet, the Supreme Court concluded that:

"Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process to insure. * * * [t]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of the state. The exercise of that privilege may give rise to obligations;

and so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue."

■ Later cases built on the *International Shoe* principle, which is controlling in our case. In Travelers Health Ass'n v. Com. of Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950), the necessary minimum contacts for service were found when a Nebraska corporation issued health insurance to approximately 800 people in Virginia, even though all transactions were carried on in Nebraska and the insurer had no office, agent, or property in Virginia, the forum state. McGee v. International Life Ins. Co., supra, provided the farthest extension of the minimum contact theory. There, California was held to have jurisdiction for service of process over the defendant, a Texas insurance company, on the basis of a single contact with a California plaintiff, although defendant did no other business in the state and all business transpired by mail. The Supreme Court ruled that:

"It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State. * * * The contract was delivered in California, the premiums were mailed there and the insured was a resident of that State when he died. It cannot be denied that California has a manifest interest in providing effective means of redress for its residents when their insurers refuse to pay claims."

The court also stressed the convenience of suit in California. There is some question about the effect of Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), on the *McGee* case. There, in a complicated fact situation, a single contact by the defendant with the forum state was held insufficient for jurisdiction. Some minimum contacts were held necessary. Despite a heavy convenience factor in getting all the parties in one forum, the Court indicated that convenience alone, with only a "unilateral activity", would not suffice to confer jurisdiction, absent minimal contacts. Whatever the impact of Hanson v. Denckla, supra, as the Fifth Circuit said, it "did not indicate that it was taking back anything said in McGee." Roumel v. Drill Well Oil Co., 270 F.2d 550, 557 (5th Cir. 1959). In the instant case, there is sufficient contact to satisfy Hanson v. Denckla and *a fortiori* to satisfy *McGee*, supra. While the exact volume of business done by defendant in Georgia is not in the record, plaintiff's unrebutted allegation is that the business is systematic and continuous. The defendant has repeatedly availed "itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Hanson v. Denckla, supra, 357 U.S. at 253, 78 S.Ct. at 1240. Even though the defendant states that no orders are accepted or placed in Georgia, the defendant does admit selling to wholesale dealers in the state. That defendant does not itself sell for retail is not relevant. While it is clear that defendant's contacts with Georgia are sufficient to make service constitutionally permissible, the court is also of the opinion that they are sufficient to satisfy the statutory purpose of § 24–113.1(b). These are, of course, separate considerations. 2 Moore, Federal Practice, ¶ 4.41–1 [3], at 1291.55. A long-arm statute like Georgia's should not be interpreted so restrictively that systematic sales at wholesale by a foreign corporation to Georgia wholesalers does not satisfy the statute. Even if the purpose of § 24–113.1 were not to extend jurisdiction as far as · *McGee*, supra, permits—and this the court does not decide—it should be interpreted to cover the instant facts.

But *International Shoe* requires more than minimum contacts. It looks to the fairness of requiring a foreign corporation to defend an action in the forum

state. In this determination, several additional factors are important. First, convenience has become an important factor. *International Shoe*, 326 U.S. at 317, 66 S.Ct. 154; *McGee, supra*, 355 U.S. at 223–224, 78 S.Ct. 199. Georgia would be the most convenient forum for the case. There are four parties in this case, three of whom either reside or have offices in Atlanta; the witnesses for the most part will probably be in Atlanta, the scene of the accident; and the evidence, such as the metal punch, trailer pin, and hammer, are in Atlanta. It would be burdensome to require all of the evidence, witnesses, and three of the parties to be moved to another forum. Second, Crescent Tool has done business in Georgia on a continuous basis. They could reasonably have foreseen that one of the costs of doing an interstate business was assumption of the obligations arising from their interstate products. Third, Georgia has a special interest in the suit because its residents would be at a severe disadvantage if they were required to follow a foreign corporation in a case like this to a distant state in order to hold it legally accountable. See *McGee, supra*, at 223, 78 S.Ct. 199.

The court now moves to the question of whether defendant's alleged negligence can be considered "a tortious act within this State", under § 24–113.1 (b) of the Georgia Code. The court holds that the negligence in this case is such a tortious act as subsection (b) was meant to cover.

Defendant argues that the only negligent act alleged is the manufacture and design of the metal punch, which took place in New York, not Georgia. Only the injury, not the "tortious act", occurred in Georgia.

A majority of the courts have held that if negligent manufacture occurs outside the forum state with only the injury inside, no tort or tortious conduct is committed within the forum state. Southern New England Distributing Corp. v. Berkeley Finance Corp., 30 F.R.D. 43 (D.Conn., 1962); Hellriegel v. Sears, Roebuck & Co., supra; Insull

v. New York World-Telegram Corp., 172 F.Supp. 615 (N.D.Ill., 1959); Mueller v. Steelcase, Inc., 172 F.Supp. 416 (D.C. Minn., 1959); Johns v. Bay State Abrasive Products Co., 89 F.Supp. 654 (D.C. Md., 1950); Bailey v. Eiler, 30 F.R.D. 375 (W.D.Pa., 1962); Hilton v. W. T. Grant Co., 212 F.Supp. 126 (W.D.Pa., 1962). However, other courts have decided that cases of negligent manufacture should be considered as tortious acts committed within the forum state when the injury occurred there. Deveny v. Rheem Mfg. Co., 319 F.2d 124 (2d Cir., 1963); Hearne v. Dow-Badische Chemical Co., 224 F.Supp. 90 (S.D. Tex., 1963); Green v. Robertshaw-Fulton Controls Co., 204 F.Supp. 117 (S.D. Ind., 1962). While many of the statutes involved in these cases may be phrased more broadly, we conclude that the Georgia courts would want § 24–113.1 (b) to be interpreted similarly. We are also of the opinion that this best fulfils its legislative purpose.

The case most in point is Gray v. American Radiator & Standard, et al., 22 Ill.2d 432, 176 N.E.2d 761 (1961). See also, Ehlers v. United States Heating & Cooling Mfg. Corp., 267 Minn. 56, 124 N.W.2d 824 (1963); Nixon v. Cohn, 62 Wash.2d 987, 385 P.2d 305 (1963). In the *Gray* case, supra, defendant, a foreign corporation, manufactured and sold valves outside of the state of manufacture, which another company inserted into heating units. Plaintiff purchased one of the units and was injured by a defect from defendant's valve. The Illinois Supreme Court had before it the Illinois Civil Practice Act, Ill.Rev.Stat. (1957), c. 110, § 17, which is very similar to § 24–113 of the Georgia Code. Illinois § 17 gave the state jurisdiction of causes of action arising out of "the commission of a tortious act within this State." The court held that although only the injury occurred in Illinois, the negligence could be considered within the statute. Since the Georgia legislature might have had the *Gray* case, supra, in mind when it wrote a very similar statute for Georgia, there is good

reason to think that the highest court in the state would similarly interpret the Georgia statute.

We come to our conclusion for several reasons. First, the *Gray* case above and its possible impact on the Georgia legislature is significant. Second, for ease of judicial administration, it may be best to adopt in jurisdictional cases the general rule for conflict of laws, which is that the place of wrong is where the last event takes place necessary to render the actor liable. That is, for purposes of applicable state substantive law in conflict of laws issues, the place of injury and not the place of the wrongful act is crucial. Restatement, Conflicts, § 377; Orr v. Sasseman, 239 F.2d 182 (5th Cir., 1957). Some courts feel that the place of wrong for choice of law purposes should not control jurisdictional problems. Lichina v. Futura, Inc., 260 F.Supp. 252, 254 (S.D.Colo., 1966); Feathers v. McLucas, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965), cert. denied, Estwing Mfg. Co. v. Singer, 382 U.S. 905, 86 S.Ct. 241, 15 L.Ed.2d 158 (1965). However, this court is of the feeling that such a rule would help localize a tort and ease jurisdictional problems. The place of actual negligence may often be difficult to determine.

Third, if jurisdiction could not be secured in Georgia, then another state would have to discern and apply Georgia's substantive law on the subjects involved here, including questions of Georgia's Workmen's Compensation law. In fact, this inconvenience would arise in every instance of a negligent manufacture outside the forum state, were this court to hold the Georgia long-arm statute inapplicable to this factual situation.

Fourth, if the court decided that the negligence here could not be considered within § 24–113.1(b), a gaping hole in Georgia's long-arm statute would be left. Cases of negligent manufacture outside the state are numerous and will continue to grow in number with the increased

tempo of interstate business being done by corporate enterprise. The purpose of the statute is to protect Georgia residents from the torts of foreign corporations suffered within this state. The beneficiaries of this act would be ill-protected if they were forced to go to distant places to sue for injuries committed within this state by negligently manufactured goods from outside. Georgia should not be a safe haven for the negligence of foreign corporations sending goods into the state. This court will not impute to the Georgia legislature nor to the Georgia courts, a desire to leave Georgia citizens unprotected in such an important, and growing, area of litigation.[4]

Last, the defendant has done a continuous business in Georgia and has availed itself of the benefits of Georgia law. It must now assume one of the burdens of the interstate, non-casual, business in which it *elected* to engage. It had reason to expect such burdens. Deveny v. Rheem, supra, 319 F.2d at 128.

For the reasons stated above, defendant's motion to quash service is denied.

## ADDENDUM TO ORDER

The court feels constrained to specifically mention applicability of Georgia Code § 24–113.1 to non-resident corporations, although neither party discussed the issue. In its initial order, the court had assumed, correctly, the provision's general applicability to out-of-state corporations. The reason for this assumption is set out below for the record.

Wilen Mfg. Co., Inc. v. The Standard Products Co., Civil Action No. 10532, N.D.Ga., March 22, 1967, held that § 24–113.1 did not apply to corporations, but only to individual non-residents. The General Assembly of Georgia then amended the Act to include corporations. Georgia Laws, 1968, p. 1419. However, the Assembly withheld any intention as to the meaning of "non-resident" before the effective date of the amendment. As

---

4. The court's opinion is not changed by the additional language in § 24–113.1(b), "except as to a cause of action for defamation of character arising from the act", as an exception to "commit a tortious act within this state."

Section 4B of the 1968 amendment stated:

"The definition of 'non-resident' in section 4A of this Act shall not be construed as expressing the intention of the General Assembly of Georgia as to the meaning of 'non-resident' as used in section 1 of this Act prior to the effective date of section 4A of this Act."

This court held that the 1968 corporation amendment to § 24–113.1 should be applied retroactively to corporate conduct prior to the effective date of the statute. Hare v. United Airlines Corp., N.D.Ga., 295 F.Supp. 860, November 5, 1968. Therefore, for reasons set out in *Hare*, supra, § 24–113.1 does apply to non-resident corporations and hence to Crescent Tool.

Thus, in accordance with this court's original order of December 27, 1968, Crescent Tool comes within the purview of the Georgia long-arm statute, § 24–113.1. As before, defendant's motion to quash service is denied.