**Martin Luther KING, Jr., Plaintiff,**

v.

**MISTER MAESTRO, INC., and 20th Century-Fox Record Corporation, Defendants.**

United States District Court
S. D. New York.

Dec. 13, 1963.

Lubell, Lubell & Jones, New York City, for plaintiff.

M. Warren Troob, New York City, for defendant Mister Maestro, Inc.; Royall, Koegel & Rogers, New York City, for defendant 20th Century-Fox Record Corp.; Charles F. Young, Stanley Godofsky, David W. Bernstein, New York City, of counsel.

WYATT, District Judge.

Plaintiff moves for a preliminary injunction restraining defendants from selling phonograph records of a speech by him or from otherwise infringing the copyright claimed for the speech. The action is for a permanent injunction, damages and an accounting.

Plaintiff is a citizen of Georgia. Defendant 20th Century-Fox Record Corporation is apparently a New York corporation although the amended complaint, if deemed to refer to it, would allege that it is a Delaware corporation. Defendant Mister Maestro, Inc. is alleged to be a New York corporation. The two defendants are each alleged to have their principal place of business in New York.

Jurisdiction rests on the fact that this action is one "arising" under an Act of Congress "relating to * * * copy-

rights" (28 U.S.C. § 1338(a)) but there is also diversity jurisdiction (28 U.S.C. § 1332(a)).

Plaintiff, a highly educated negro clergyman, has been also for some time a distinguished and effective leader in the movement to secure equal civil rights for negro citizens. As such he has developed a unique literary and oratorical style and has delivered lectures, sermons and addresses to large crowds in many parts of the nation.

On June 23, 1963 in an auditorium at Detroit, Dr. King made a speech to which he gave no title but in the course of which he used the words "I have a dream".

Thereafter an assembly or "march" for civil rights was planned for Washington on August 28, 1963. Dr. King was one of the organizers and was invited to deliver a speech. He wrote his speech from time to time between August 24 and August 28, 1963; it was finished about 4 o'clock in the morning of August 28. The speech contains some of the ideas and words of the Detroit speech, but is much longer and has a great deal not contained in the Detroit speech.

■ Dr. King had been asked by the organizing committee to furnish a "summary or excerpts" of his prepared speech, this for the purpose of being read and made available to the press at a press conference in the afternoon or evening of August 27, 1963. Dr. King could not and did not comply with this request because his speech was not finished in time. He did, however, in the morning of August 28 send his speech—substantially in the form later delivered—to the "press liaison personnel of the Washington office of the March on Washington Committee". Dr. King says that he did not intend his speech "to be generally distributed or generally made available to the public at large" but to be "specifically limited in use to assisting the press coverage of the March by the press". The intent of Dr. King is legally irrelevant; the question is solely with what he did. National Comics Publications v. Fawcett Publications, 191 F.2d 594 (2d Cir. 1951). In fact, the speech was mimeographed as an "advance text" and put into a "press kit" (containing other material also) which was made available to the press some time in advance of delivery of the speech. Dr. King says that this mimeographing and distribution as part of the press kit was without his "personal advance knowledge thereof or consent thereto".

Dr. King did deliver a copy of his speech to the press representatives of the organizing committee and apparently did not forbid its reproduction for the press. While he may not have known of such reproduction or have expressly consented to it, the use made of it seems natural and reasonable. The significant and important fact is that the copies of the speech were distributed *only to the press* and that this distribution took place only in the "press tent". Such is the showing made in the affidavit for defendants of the editor of Fox Movietone News who secured a copy of Dr. King's speech at the press tent on the morning of August 28. The only reasonable conclusion is that the distribution of copies of the speech was limited to the press. There is not even a suggestion that any copies were offered to, or made available to, the general public.

The "advance text" has no title and from this it seems that Dr. King had not given it a title.

In the afternoon of August 28, some 200,000 people gathered before the Lincoln Memorial in Washington for a "freedom" demonstration in behalf of civil rights for negro citizens. Among the speeches delivered was that by Dr. King.

Apparently it was Dr. King's speech which most stirred and impressed the crowd, especially his repetition of the words "I have a dream". The New York Times reported (August 29, 1963, page 16, column 1) that it was Dr. King "who ignited the crowd with words that might have been written by the sad, brooding man enshrined within" the Memorial; the Times then quoted from the speech its repetitions of the words "I have a dream". On the front page of The New

York Times for August 29, 1963, there is a feature article (by James Reston, Chief of the Times' Washington Bureau) on Dr. King's speech under the headlines: " 'I Have a Dream * * *' Peroration by Dr. King Sums Up A Day the Capital Will Remember". The flavor of the occasion is perhaps best expressed by this quotation from the article:

"I have a dream" he cried again and again. And each time the dream was a promise out of our ancient articles of faith: phrases from the Constitution, lines from the great anthem of the nation, guarantees from the Bill of Rights, all ending with a vision that they might one day all come true. * * *

"Dr. King touched all the themes of the day, only better than anybody else."

Dr. King's speech (along with the speeches of others made at the same time) was broadcast by television and radio, recorded (sound and pictures) for newsreels, was later shown in movie houses, and of course was widely reported in the press. Excerpts from Dr. King's speech were published in many newspapers. The New York Post in its issue of September 1, 1963 published the complete text of the speech under the title "I Have A Dream * * *". The Post thereafter offered for sale reprints of the speech. Dr. King says that he has not consented in any way to such reprinting and sale of the speech and did not give to the Post any copy of his speech.

Defendant 20th Century-Fox Record Corporation and Movietonews, Inc. are subsidiaries of Twentieth Century Fox Film Corporation. Movietonews, Inc. produces a newsreel for movie theaters called "Fox Movietone News" and took pictures of and made a sound record of Dr. King's speech on August 28, 1963 and of the speeches made on the same occasion by five other speakers.

Defendant 20th Century-Fox Record Corporation made a phonograph record from the newsreel sound track of the speeches including that of Dr. King, and about September 18, 1963 began selling these records in a cover, with a picture from the newsreel film of the crowd in front of the Lincoln Memorial. The cover is entitled "Freedom March on Washington August 28, 1963" and states that the record is of the speeches made that day (including that of Dr. King) which were "recorded live by Fox Movietone News". The record has both the voice and the words of Dr. King. Sales of the record have continued.

Defendant Mister Maestro, Inc. made and is selling a somewhat similar record entitled "The March on Washington", which record does not on its cover or elsewhere refer to Dr. King. The record does contain, however, part or all of the speech of Dr. King as delivered by him in Washington; it has both the voice and the words of Dr. King.

Defendants are selling their records without the consent of Dr. King and of course without paying anything to him.

After the Washington speech, a phonograph record of some of Dr. King's speeches was offered for sale with his consent by Motown Record Corp. This record is in a cover entitled "The Great March to Freedom—Rev. Martin Luther King Speaks—Detroit June 23, 1963." This record does not contain the Washington speech; it does contain the much shorter Detroit speech under the title "I Have A Dream". Dr. King says that this title was given to the Detroit speech by Motown after it "saw the widespread public reception accorded said words when used in the text of my address to the March on Washington".

On September 30, 1963 Dr. King sent a copy of his speech to the Copyright Office for deposit and at the same time sent an application form for a certificate of registration of his claim to copyright. 17 U.S.C. §§ 11, 12, 207. The class to which the work was claimed to belong was Class C—"[l]ectures, sermons, addresses (prepared for oral delivery)". 17 U.S.C. § 5(c); 37 C.F.R. § 202.1. The "title of the work" was said to be "I Have A Dream". The claim to copy-

right was under 17 U.S.C. § 12, "works not reproduced for sale"—unpublished works.

The complaint was filed on October 4, 1963 and named three defendants—Mister Maestro; Inc., Twentieth Century Fox, Inc., and Motown Record Corp. On the same day, Judge Bryan made an order to show cause bringing on the present motion.

Before the motion was heard, plaintiff served and later filed an amended complaint, naming only two defendants: Mister Maestro, Inc. and Twentieth Century Fox Film Corporation. By later stipulation, 20th Century-Fox Record Corporation was in effect substituted for Twentieth Century Fox Film Corporation as a defendant, the caption was amended accordingly, and references in the amended complaint to Twentieth Century Fox Film Corporation were deemed to be made to 20th Century-Fox Record Corporation.

While the file shows no return of service by the Marshal, counsel for defendants Mister Maestro, Inc. and 20th Century-Fox Record Corporation have appeared to oppose this motion and an affidavit on file shows that a copy of the summons and complaint were delivered to counsel for these two defendants and that counsel agreed to accept service. The two defendants are therefore before the Court and subject to its jurisdiction.

The motion was heard on October 8 and 9, 1963 and at that time no certificate of registration had issued.

Subsequently a Class C certificate was duly issued, showing receipt of the application therefor on October 2, 1963.

Dr. King then authorized publication of his speech in circular form, with notice of copyright. Copies were then sent to the Copyright Office for deposit and at the same time an application form was sent for a certificate of registration of the claim of Dr. King to copyright. 17 U.S.C. §§ 10, 11, 207. The class to which the work was claimed to belong was Class A—"books * * *". 17 U.S.C. § 5(a); 37 C.F.R. § 202.1. The claim to copyright was under 17 U.S.C. § 10, "publication of work with notice"—published works.

Subsequently a Class A certificate was duly issued, showing receipt of the application therefor on October 21, 1963.

There seems to be no real dispute as to the facts set forth. The application raises only questions of law and if these are decided for plaintiff, a preliminary injunction is appropriate and necessary.

As an original proposition, it seems unfair and unjust for defendants to use the voice and the words of Dr. King without his consent and for their own financial profit. Of course, decision cannot be made simply because of such a feeling. This is a Court of law which must look to legal principles established by the Congress and by higher Courts. But under the circumstances here present it does seem that defendants should demonstrate that their use of the voice and words of plaintiff is permitted by legal principles so established.

The general principles of law here involved are relatively simple; their application in some cases is difficult.

At common law there was a property right in an unpublished work but after publication there was no copyright protection.

Congress has provided copyright protection after publication on certain conditions and also on conditions has given such protection before publication, somewhat parallel to the common law property right which the legislation specifically recognizes.

Statutory copyright may be obtained for "[l]ectures, sermons, addresses (prepared for oral delivery)". 17 U.S.C. § 5(c). The copyright may be obtained before any publication of such works but as soon as publication occurs there must be compliance with the requirements as to published works. 17 U.S.C. §§ 10, 12. Ordinarily the public performance of a work—such as delivery of a speech or performance of a play—is not a publication.

Thus on general principles there is no reason why Dr. King could not obtain copyright protection under the laws of Congress for his speech.

The arguments for defendants must be considered.

■ It is first suggested that the speech was not sufficiently original to be the subject of copyright, because it was preceded by a similar speech of plaintiff in Detroit. It is doubtful that the rights of plaintiff would be lost even if the two speeches of plaintiff were exactly the same. But the argument is without merit in any event because the two speeches are sufficiently different in length, content and otherwise that the former does not destroy the originality for copyright purposes of the latter. Alfred Bell & Co. v. Catalda Fine Arts, 191 F.2d 99 (2d Cir. 1951).

■ The substantial argument for defendants, and one which must be carefully considered, is that Dr. King lost any right to copyright protection because what he did in Washington placed the speech in the public domain (dedicated it to the public, as it is sometimes put) because it amounted to a publication without obtaining a copyright. There can be no copyright of any work in the public domain. 17 U.S.C. § 8.

Defendants stress the public nature of the delivery of the speech by Dr. King— the enormous crowd, the radio and television broadcasts, the movie newsreel pictures. The question is: was this a general publication of the speech so as to place it in the public domain?

■ The word "general" with respect to publication in this sense is of greatest significance. There can be a limited publication, which is a communication of the work to others under circumstances showing no dedication of the work to the public. A general publication is one which shows a dedication to the public so as to lose copyright.

The public exhibition of a painting without notice of copyright in a gallery the rules of which forbade copying is not a general publication. Werckmeister v. American Lithographic Co., 134 F. 321, 68 L.R.A. 591 (2d Cir. 1904). In affirming in this case, the Supreme Court said: "One *or many* persons may be permitted to an examination under circumstances which show no intention to part with the property right, and it will remain unimpaired." (American Tobacco Company v. Werckmeister, 207 U.S. 284, at 299, 28 S.Ct. 72, at 77, 52 L.Ed. 208, emphasis supplied).

The public performance of a play is not a general publication. Ferris v. Frohman, 223 U.S. 424, 435, 32 S.Ct. 263, 56 L.Ed. 492 (1912).

The public delivery of lectures on a memory system is not a general publication. Nutt v. National Institute Incorporated for the Improvement of Memory, 31 F.2d 236 (2d Cir. 1929).

The playing of a song in public is not a general publication of the work. Heim v. Universal Pictures Co., 154 F.2d 480 (2d Cir. 1946).

The broadcast by radio of a script is not a general publication thereof. Uproar Co. v. National Broadcasting Co., 8 F.Supp. 358, 362 (D.Mass.1934).

■ The copyright statute itself plainly shows that "oral delivery" of an address is not a dedication to the public. Sections 5(c) and 12 (of Title 17 U.S.C.) taken together show that Congress intended copyright protection for "[l]ectures, sermons, addresses (prepared for oral delivery)" despite such "oral delivery".

It has never been suggested that the number of persons in the audience had any effect on the principle. The Supreme Court in the Werckmeister case, above, referred to "one or many". The Court in the Nutt case, above, used the expressions "publicly delivered", "public performance" and "public delivery", and finally stated that "the delivery of these lectures before audiences prior to copyrighting was limited publication" (31 F.2d at 238). Nothing whatever is said about the *size* of the "audiences".

A recognized authority in the field after an analysis of the principles and

the cases states the criterion to be as follows (Nimmer, Copyright Publication, 56 Col.L.Rev. 185, 197 (1956)):

> "This analysis suggests that a *sine qua non* of publication should be the acquisition by members of the public of a possessory interest in *tangible* copies of the work in question."

And elsewhere (195) the same author says:

> "The principle that public performance does not constitute a publication of the work being performed is well established in the American law of copyright and, unlike the effect of the sale of phonograph records, is not the subject of any serious debate among copyright lawyers."

It should also be noted that in considering the questions of copyright in Public Affairs Associates, Inc. v. Rickover, 177 F.Supp. 601 (D.C.1960), reversed 109 U.S.App.D.C. 128, 284 F.2d 262 (1960), reversed 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962), none of the judges or justices paid any attention to the number of persons in the audiences addressed by Admiral Rickover.

■ The "oral delivery" of his speech by Dr. King, no matter how vast his audience, did not amount to a general publication of his literary work.

Defendants stress the delivery without copyright notice of an advance text of his speech and the distribution of it to the press. But within the concept of publication just examined, it is clear that this was a *limited*, as opposed to a general, publication. There is nothing to suggest that copies of the speech were ever offered to the *public*; the fact is clear that the "advance text" was given to the press only.

This is a very different situation from that in the Rickover case, above. In Rickover, there was "a wide distribution not only to the press but also to people generally who desired copies through interest in the subjects of the addresses"; the Admiral not only attempted "to se-cure publicity * * * through the channels of information" but went "beyond customary sources of press or broadcasting in distributing the addresses to any interested individual" (284 F.2d at 270). The Court of Appeals majority then expressed its conclusion (284 F.2d at 271):

> "Since the distribution was not limited in any way to a particular group, no question exists in this case as to the extent of any limitation so as to avoid 'publication' in the copyright sense. Anyone was welcome to a copy.
>
> "Nor do we have any problem as to limited use of the addresses by the press for fair comment. The press was free to use the speeches in whole or in part for their news value. But such ephemeral use is far different from the unlimited distribution to anyone who was interested which is manifested by the agreed statement of facts. It is the complete absence of limitation on the use of the printed distributions by anyone at any time which destroyed the common law rights of the author."

These facts are not here present. Moreover, Judge Washington would have given Admiral Rickover protection in any event. He declared in his dissent (with which this Court is in agreement) as follows (284 F.2d at 273):

> "Speeches of men in the forefront of public life are unique among literary products. Not only are they often works of considerable literary merit, but they may also be 'news' of the first importance. As 'news' they deserve the widest unfettered contemporaneous dissemination. Where, as here, an author seeks to advance this end by making copies of his speeches available to the press and other interested persons, he is serving the public's interest as well as his own. But insofar as they have a commercial value as literary works after their immediate news importance has passed, they belong appropriately to their creator. The public

**108**

interest in the news value of the author's work may cut across or postpone his rights; but that is not to say that it extinguishes them."

The treatment of the Rickover case in the Supreme Court is not relevant here because the Supreme Court addressed itself primarily to procedure and to the position of the Admiral as an officer of the United States.

The conclusion seems plain that there was no general publication by Dr. King in making his speech available to the press.

▉ Having concluded that the copyright is valid and copying being evident —even to reproduction of the voice of plaintiff—the question as to irreparable damage becomes of much less significance than ordinarily. In such a situation, it has been said that a preliminary injunction should issue "without a detailed showing of danger of irreparable injury". Joshua Meier Co. v. Albany Novelty Mfg. Co., 236 F.2d 144 (2d Cir. 1956). The same rule has been directed to be applied in copyright cases. Rushton v. Vitale, 218 F.2d 434 (2d Cir. 1955).

It appears that plaintiff has made, or is making, arrangements to market phonograph records of his speech through an organization of his own choosing, the profits from which can be, and are intended to be, used by him in whole or in part to aid the causes with which he is identified. Competition by defendants would seem clearly to show danger of an irreparable injury.

There are thus no principles which prevent relief to plaintiff from what seems the unfair and unjust use by defendants of his speech and his voice. His right to a preliminary injunction is established.

The findings of fact and conclusions of law are contained herein. Fed.R.Civ.P. 52(a).

Settle order on notice, observing the requirements of Fed.R.Civ.P. 65(d) and suggesting the amount of security to be given under Fed.R.Civ.P. 65(c).