C. Brian **BURKE**, M.D.

v.

**NATIONAL BROADCASTING COMPANY, INC.**

**Civ. A. No. 77–236.**

United States District Court, D. New Hampshire.

Dec. 11, 1978.

As Amended Dec. 28, 1978.

Randolph J. Reis, Brown & Nixon Professional Ass'n, Manchester, N. H., for plaintiff C. Brian Burke, M.D.

James E. Higgins, Sheehan, Phinney, Bass & Green, Professional Ass'n, Manchester, N. H., for defendant National Broadcasting Co.

## ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

MALETZ, Judge [1]:

This is an action seeking damages and other relief for claimed infringement of plaintiff's alleged common-law copyright in a motion picture film. Jurisdiction is based on diversity of citizenship and the amount in controversy exceeds $10,000. The facts

[1.] Judge of the United States Customs Court sitting by designation pursuant to 28 U.S.C. § 293(b).

bearing on the question of liability [2] are not in dispute and to the extent relevant are as follows:

In March 1972, the plaintiff, Dr. C. Brian Burke, a New Hampshire anesthesiologist, while on a photographic safari on the Serengeti Plain in East Africa (now Tanzania) observed and filmed an unusual affray between a zebra mare and a lioness. Specifically, after the lioness had attacked and killed a zebra foal, thereby causing the herd to scatter, the maternal mare returned and attacked the lioness. The ensuing combat constituted the subject matter of a short film that was taken by Dr. Burke and referred to by him as the "Serengeti Incident."

Subsequently, in the April 1972 edition of *Natural History* there appeared an article by a Dr. George Schaller stating that zebras do not protect their young against lions. After reading this article, Dr. Burke responded by way of a letter to *Natural History* and Dr. Schaller in which he informed them that he had witnessed and filmed an incident contrary to Dr. Schaller's assertion. This letter was printed in the August/September 1972 issue of *Natural History.*

One Bernhard Grzimek, a professor at the University of Giessen in Frankfurt, Germany, and a co-editor of *Das Tier (The Animal)* magazine read Dr. Burke's letter in *Natural History* and thereafter on September 3, 1973, wrote the following letter to Dr. Burke:

I just found your letter in NATURAL HISTORY, August/September 1972 page 12 "Incident in the Serengeti". I hope that you have no objection that we print a German translation of your letter in our journal DAS TIER (THE ANIMAL). We also would like to get a copy of your pictures and, in case you have done several, of the other ones too.

I personally would like to use the film which was done of this incident in my lectures at the university and in a television programme. Is this film still availa-

ble? Was it done in colour? Would it be possible to get a copy of it on my expenses?

Many thanks in advance of your co-operation.

By letter dated September 17, 1973, Dr. Burke replied to Professor Grzimek as follows:

Thank you for your letter. It is for me a great honour that you wish to translate my letter "Incident in the Serengeti" into "das Tier."

The pictures and the film will be returned to me shortly, and as soon as I receive them I shall send them to you. The interesting film and the pictures are in colour. The film was taken with Super 8mm film and 18 frames per second, therefore I am not quite certain if the film is feasible for television-broadcasting. This I will leave to the technicians. In February I will visit East Africa, and who knows what the Serengeti has to show.

After receiving Dr. Burke's film, Professor Grzimek had it shown during the course of his lectures and on public television in West Germany.

Several years later, Professor Grzimek was contacted by Colin Willock, the executive director of Survival Anglia Limited (SAL), a British company specializing in nature films. In his letter to Grzimek, dated November 17, 1976, Mr. Willock requested a copy of Dr. Burke's film for use in a Special television program about animal parenthood that SAL was producing. Professor Grzimek responded by letter dated November 24, 1976, advising that he was forwarding the film as requested and added that "[I]n the text must be mentioned that this shot was taken by an American visitor . . . [Dr. Burke] . . . ." SAL used 33 feet of Dr. Burke's film as part of its one-hour Special entitled "The Parenthood Game". This Special was purchased by the defendant National Broadcasting Company (NBC) from SAL and telecast

---

**2.** These cross-motions for summary judgment concern only the question of liability, which is why plaintiff's motion seeks only partial summary judgment.

over its network on January 27, 1977, from 8:00 to 9:00 p.m. As a result of NBC's use of the Special, which contained the footage in question, Dr. Burke has brought this suit alleging that NBC has violated his copyright in the film. It is to be observed that Dr. Burke has neither applied for nor received a copyright in the film pursuant to 17 U.S.C. § 101, *et seq.* (1976), or any other statutory source. Therefore, this action is based solely on availability of a common-law copyright.

Turning to the legal considerations, it is basic that one is entitled to an absolute common-law copyright in his work where he has not sought a federal statutory copyright. E. g., *American Tobacco Co. v. Werckmeister,* 207 U.S. 284, 28 S.Ct. 72, 52 L.Ed. 208 (1907). This common-law copyright is an absolute property right which extends to television broadcasts and motion picture films and protects against unauthorized copying, publishing, vending, performing, recording, etc. 18 Am.Jur.2d, *Copyright and Literary Property* § 7 *et seq.* (1965); Nimmer, *On Copyright,* Vol. 1, § 56, *et seq.* (1976).

This common-law copyright remains with the creator until he permits a general publication, at which point the work becomes the property of the general public. *American Tobacco Co. v. Werckmeister, supra* at 299, 28 S.Ct. 72. Thus, the existence of Dr. Burke's copyright hinges on whether or not he permitted a general publication of his film to occur prior to its January 27, 1977 telecast by NBC.

Whether or not a "general publication" occurred does not depend on the actual intention of the creator; his intention is irrelevant. Rather, the question depends on what the creator did, i. e., whether or not he voluntarily parted with the property. *King v. Mister Maestro, Inc.,* 224 F.Supp. 101, 103 (S.D.N.Y.1963). It is to be added that the test of general publication applies " . . . in this or any foreign country . . . ." *Caliga v. Inter Ocean Newspaper Co.,* 215 U.S. 182, 189, 30 S.Ct. 38, 40, 54 L.Ed. 150 (1909).

In contrast to a general publication, a limited publication does not divest the holder of his common-law protection. As the court stated in *White v. Kimmell,* 193 F.2d 744, 746–47 (9th Cir. 1952):

[A] limited publication which communicates the contents of a [work] to a definitely selected group and for a limited purpose, and without the right of diffusion, reproduction, distribution or sale, is considered a 'limited publication', which does not result in loss of the author's common law right to his [work]; but that the circulation *must be restricted both as to persons and purpose,* or it can not be called a private or limited publication. [Emphasis added.]

In *White v. Kimmell,* the plaintiff White was seeking a declaratory judgment that certain manuscripts produced by her husband were in the public domain and therefore the defendant did not possess an exclusive right to them. Specifically, upon completion of his book, Mr. White made several hundred copies which he distributed to anyone who requested a copy. He even allowed his secretary to distribute them to persons whom she knew might be interested in the subject matter. Each copy was accompanied by a short letter in which Mr. White expressed his hope that the reader would enjoy the book, and could either keep the book or pass it on to someone else. Similarly, he allowed one individual to make additional copies for distribution to her friends.

In holding that Mr. White had *generally* published his book, the court held that neither part of the "limited publication" test was satisfied, for the court found that Mr. White placed no restrictions on either the group of persons who could obtain a copy of his manuscript or on the purpose for which it could be used.

In point also is *American Visuals Corp. v. Holland,* 239 F.2d 740 (2d Cir. 1956). There, the plaintiff had distributed a copy of its pamphlet on public safety to some 200 insurance companies with the hope that they would purchase additional copies for distribution to their customers. The court noted

that this activity alone would have constituted "limited publication" since it was sent to a limited group of persons (insurance companies) for a limited purpose (to solicit business). However, the plaintiff also left a number of copies on a table in the lobby of a hotel where an insurance convention was being held. Accordingly, since the plaintiff left the table unattended allowing anyone to obtain a copy of the pamphlet, the court ruled that a "general publication" had resulted due to the fact that there was a distribution where " . . . no limitation was placed on the person who might obtain copies." *Id.* at 743. *See also e. g., Patterson v. Century Production,* 93 F.2d 489, 492 (2d Cir. 1937); *Werckmeister v. American Lithograph Co.,* 134 F. 321 (2d Cir. 1904); *Jacobs v. Robitaille,* 406 F.Supp. 1145, 1149 (D.N.H.1976).

█ What this comes down to is that the "word 'general' with respect to publication . . . is of greatest significance. There can be a limited publication, which is a communication of the work to others under circumstances showing no dedication of the work to the public. A general publication is one which shows a dedication to the public so as to lose copyright." *King v. Mister Maestro, Inc., supra,* 224 F.Supp. at 101. For example, as the court in *King* noted (*ibid.*), the performance of a play is not a general publication; the public delivery of lectures on a memory system is not a general publication; the playing of a song in public is not a general publication of the work; the broadcast by radio of a script is not a general publication thereof. In brief, the oral dissemination or performance of a literary, dramatic, or musical work does not constitute a publication of that work. For a *sine qua non* of publication is the acquisition by members of the public of a possessory interest in *tangible* copies of the work in question—and manifestly in the foregoing examples nothing tangible is communicated to the public. *Nimmer, supra,* §§ 52 and 53.

Thus, in *King,* the court held that delivery by Dr. Martin Luther King of his famous speech, "I Have A Dream" before a vast public audience and over radio and television did not amount to a general publication of his literary work.

Nor under the court's reasoning did Dr. King's distribution to the press of a mimeographed text of the speech on the morning of the demonstration constitute a general publication. Though these were tangible copies, the court pointed out that "it is clear that this was a *limited,* as opposed to a general publication." "There is nothing", the court continued, "to suggest that copies of the speech were ever offered to the *public*; the fact is clear that the 'advance text' was given to the press only" [Emphasis in original] 224 F.Supp. at 107. The *King* case thus fits squarely within the standard set forth in *White v. Kimmell, supra,* for a limited publication, namely that the circulation be limited as to persons (the press) and purpose (to assist them in following the speech).

█ It is against this background that we turn to the present case. Based on the undisputed facts, it is clear that when Dr. Burke voluntarily gave Professor Grzimek the film knowing it would be copied and used on German television, he allowed a general publication to occur. For, as previously indicated, the test of a general publication applies in this or any foreign country. More particularly, it seems evident that when Dr. Burke sent Professor Grzimek his film to be used in classroom lectures and on German television, he did not expressly or impliedly restrict it either as to persons or purposes. Specifically, in Dr. Burke's letter to Professor Grzimek dated September 17, 1973, he promised to send the film and merely added that he hoped the Super 8mm film he had used would be suitable for a television program. It is thus apparent that Dr. Burke placed no restrictions on the persons who could view the film, nor did he express any limitations upon the purposes for which it could be shown. In short, the record establishes that Dr. Burke has failed to satisfy both parts of the "limited publication" test, and hence permitted a general publication to occur.

Not only did Dr. Burke fail to restrict or limit his authorization, the language of his

letter of September 17, 1973, to Professor Grzimek suggests that he was honored that professional naturalists were interested in his amateur work. Dr. Burke's submission of his film to Professor Grzimek without copyright notice and without any restrictions as to use was not an action evidencing a proprietary interest in the film. There is nothing in Dr. Burke's communication to Professor Grzimek which even suggested that other copies of the film could not be made and distributed. This is evidenced by Grzimek's willingness to allow SAL to copy and use the film.

For the foregoing reasons, plaintiff's motion for partial summary judgment is denied; defendant's cross-motion for summary judgment is granted and the action is dismissed. Judgment will be entered accordingly.