508 F.Supp. 854 (1981)
The MARTIN LUTHER KING, JR. CENTER FOR SOCIAL CHANGE, INC.; Mrs. Coretta Scott King, Administratrix of the Estate of Dr. Martin Luther King, Jr., Deceased; and Motown Record Corp.
v.
AMERICAN HERITAGE PRODUCTS, INC.; B & S Sales, Inc., a/k/a B & S Sales; and James E. Bolen and James F. Bolen.
Civ. A. No. 80-2253A.
United States District Court, N. D. Georgia, Atlanta Division.
February 20, 1981.
*855 *856 Archer D. Smith, III, Harmon, Smith & Bridges, Atlanta, Ga., for plaintiffs.
James D. Ruppert, Ruppert, Bronson & Chicarelli, Franklin, Ohio, for defendants.

ORDER
RICHARD C. FREEMAN, District Judge.
Plaintiffs, The Martin Luther King, Jr. Center for Social Change, Inc. (Center), a non-profit corporation, Mrs. Coretta Scott King, Administratrix of the Estate of Dr. Martin Luther King, Jr. (Estate), and Motown Record Corporation, a holder of certain copyrights, seek a preliminary injunction, Rule 65(a), Fed.R.Civ.P., against defendants. They allege, inter alia, that defendant American Heritage Products, Inc. of Franklin, Ohio, is unlawfully manufacturing and selling plastic busts of Dr. King, and marketing the busts using the name of the Center and excerpts from copyrighted speeches of Dr. King in its advertisements and other materials. Plaintiffs seek damages as well as injunctive relief.
Defendant James F. Bolen is the sole proprietor of a business known as B & S Sales, which manufactures and sells various plastic products as funeral accessories. James E. Bolen, who is the son of James F. Bolen, has worked in his father's business at various times and has often loaned money to his father for use in B & S Sales. Defendant James E. Bolen developed the concept of marketing a plastic bust of Dr. King, and formed a company, B & S Enterprises, to sell the busts, which would be manufactured by B & S Sales. B & S Enterprises was later incorporated in Ohio under the name of American Heritage Products, Inc. in October 1980.
Although Bolen sought the endorsement and participation of the Center in the marketing of the bust, the Center refused Bolen's offer. Bolen pursued the idea, nevertheless, hiring an artist to prepare a mold, and an agent to handle the promotion of the product. Defendant took out two half-page advertisements in the November and December 1980 issues of Ebony magazine, which purported to offer the bust as "an exclusive memorial" and "an opportunity to support the Martin Luther King, Jr. Center for Social Change." Plaintiffs' Exhibits 9a, 9b. The advertisement stated that "a contribution from your order goes to the King Center for Social Change." Out of the $29.95 purchase price, defendant Bolen testified he set aside 3%, or $.90, as a contribution to the Center.[1] The advertisement also *857 offered "free" with the purchase of the bust a booklet about the life of Dr. King entitled "A Tribute to Dr. Martin Luther King, Jr."
In addition to the two advertisements in Ebony, defendant published a brochure or pamphlet (Pamphlet) which was inserted in 80,000 copies of black newspapers across the country. The brochure reiterated what was stated in the magazine advertisements, and also contained photographs of Dr. King and excerpts from his speeches. The brochure promised that each "memorial" (bust) is accompanied by a Certificate of Appreciation "testifying that a contribution has been made to the Martin Luther King, Jr. Center for Social Change." Plaintiffs' Exhibits 2, 4.
Plaintiffs originally came before this court on January 12, 1981 seeking a temporary restraining order, Rule 65(b), Fed.R. Civ.P. By consent of the parties, a temporary restraining order was entered to remain in effect until February 10, 1981. An evidentiary hearing on plaintiffs' motion for a preliminary injunction was subsequently held by this court on February 10 and 11, 1981.
The action is currently before the court on defendants' motion to dismiss the complaint for lack of personal jurisdiction and improper venue, Rules 12(b)(2), (b)(3), plaintiffs' motion for leave to amend their complaint, Rule 15, and plaintiffs' motion for a preliminary injunction, Rule 65(a), Fed.R. Civ.P. For the reasons that follow, we will deny defendants' motion to dismiss, grant plaintiffs' motion to amend, and grant in part and deny in part plaintiffs' motion for a preliminary injunction.

I. Motion to Dismiss

The plaintiffs state claims in tort in this diversity action under Georgia Code §§ 35-1010 (unauthorized use of name when soliciting contributions), 106-201 (imitation of name, style, or emblem), 106-503 (false or fraudulent statement in advertising), 106-702 (deceptive trade practices), 106-1201 et seq. (fair business practices act), and 17 U.S.C. § 106 (copyright infringement). All of the named defendants are citizens of Ohio. In order to obtain personal jurisdiction over the defendants, the plaintiffs must invoke Georgia's long-arm statute, Ga.Code § 24-113.1. That section provides:
A court of this State may exercise personal jurisdiction over any nonresident, or his executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use or possession enumerated in this section, in the same manner as if he were a resident of the State, if in person or through an agent, he:
(a) Transacts any business within this State; or
(b) Commits a tortious act or omission within this State, except as to a cause of action for defamation of character arising from the act; or
(c) Commits a tortious injury in this State caused by an act or omission outside this State, if the tortfeasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this State; or
(d) Owns, uses or possesses any real property situated within this State.
Defendants argue that they do not have the minimum contacts with the forum that are required under Georgia law and constitutional standards of due process to permit this court to exercise jurisdiction over them. See International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
Most of the cases cited by defendants construe subsection (a) of the statute. We have held this "transacting business" provision, however, to be inapplicable to tort actions. Scott v. Crescent Tool Co., 296 *858 F.Supp. 147, 152-53 (N.D.Ga.1968). Plaintiffs instead rely primarily on subsections (b) and (c). These portions of the Georgia long-arm law have been held to extend Georgia's assertion of personal jurisdiction "to the maximum limits permitted by due process." Shellenberger v. Tanner, 138 Ga. App. 399, 227 S.E.2d 266, 273 (1976). See Freeman v. Motor Convoy, 409 F.Supp. 1100, 1106-07 (N.D.Ga.1976). The commission of a negligent act outside the state causing injury within the state may constitute commission of a tortious act within the state. See Coe & Payne Co. v. Wood-Mosaic Corp., 230 Ga. 58, 195 S.E.2d 399 (1973). For subsection (b) to furnish a jurisdictional base for plaintiffs' claim against the nonresident movants, plaintiffs must show three things:
(1) The nonresident has purposefully done some act or consummated some transaction with or in the forum (but the actual act or omission resulting in the injury here need not have occurred in this state) .... (2) The Georgia plaintiff must have a legal cause of action in tort against the nonresident, which arises out of, or results from, the purposeful activity of the defendant involving this state; .... and (3) If the requirements of (1) and (2) are satisfied, the exercise of jurisdiction over the nonresident must be "reasonable."
Shellenberger v. Tanner, 138 Ga.App. at 404, 227 S.E.2d at 273.
Plaintiffs allege the following jurisdictional facts, which are uncontested by defendants:
(1) Defendants' agent visited the Center in Atlanta, Georgia with the objective of obtaining endorsement of the bust from the Center and approval of the product for sale at the gift shop at the Center.
(2) Defendants' agent negotiated and signed a contract in Atlanta with the National Data Corporation, a telephone answering service. Defendants employed National Data to receive orders from consumers by telephone. All the calls from other states were channelled through Atlanta; consumers from Georgia called a toll-free number in Chicago.
(3) Eight orders were solicited from Georgia residents, and seven completed sales of the busts were made.
(4) Defendants placed an advertisement in two consecutive monthly issues of Ebony, a national magazine, which was distributed throughout Georgia.
(5) Defendants placed several telephone calls to the law firm of Harmon, Smith & Bridges in Atlanta, agents of the Center and Estate, in regard to their product and the possibility of the involvement of the Center in the sale and marketing of the busts.
Thus, the first and second elements of the statute have been satisfied. The alleged injury occurred in Georgia, as well as in many other states where advertisements were seen or distributed and busts were sold. In addition, the defendants purposefully entered Georgia and contacted plaintiffs in regard to their proposed product, entered into a contract with a Georgia corporation for the receipt of telephone orders, and sold several of the products to Georgia residents. Plaintiffs have also stated a legal cause of action in tort against movants for copyright infringement, deceptive trade practices, and appropriation of Dr. King's likeness.
Movants contend, however, that it is unreasonable to ask them to defend a suit away from their residence, and therefore due process considerations of fairness preclude the application of the statute in this case. We disagree. Professor Moore has summarized the rule of International Shoe and its progeny as forbidding the exercise of personal jurisdiction over a foreign defendant where there is a minimum of contacts and the cause of action does not arise out of the contacts. 2 Moore's Federal Practice ¶ 4.25[5] at 4-266 (2d ed. 1980). Here, all of the defendants' contacts with the forum were related to and in furtherance of the tortious acts complained of. It would be even more unreasonable to expect *859 plaintiffs to bring a suit in a foreign forum on a cause of action arising in their home state and applying the law of Georgia. The courts of Georgia, and hence this court, may exercise jurisdiction over movants.[2]
As a final threshold matter, defendants also contend that venue and personal jurisdiction under the federal copyright law cannot be exercised in this district. 28 U.S.C. § 1400. Both parties concede, however, that if jurisdiction and venue are properly asserted under the Georgia long-arm statute and 28 U.S.C. § 1391, they are sufficient to meet the standard under 28 U.S.C. § 1400. Droke House Publishers, Inc. v. Aladdin Distributing Corp., 352 F.Supp. 1062 (N.D.Ga.1972). Because we find that personal jurisdiction and venue are proper in this case, we also dismiss defendants argument under 28 U.S.C. § 1400.

II. Motion to Amend

Plaintiffs move under Rule 15, Fed.R. Civ.P., for leave to amend their complaint. They wish to add additional facts, as well as allegations that defendants printed and published a booklet entitled "A Tribute to Dr. Martin Luther King, Jr." (Booklet), which infringes plaintiffs' copyright by quoting substantial passages from Dr. King's copyrighted speeches. Defendants object to this amendment on two grounds. They argue that because plaintiffs did not include the Booklet claims in the original complaint, defendants went ahead and printed it, incurring additional expenses. They also argue that there is no evidence that the Booklet has been distributed in Georgia.
Rule 15 requires that leave to amend "be freely given when justice so requires." Generally, amendment will be permitted unless the proposed amendment is totally frivolous or will result in prejudice to the defendant. See Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Defendants' expenditure of sums in furtherance of an alleged copyright violation does not constitute "prejudice" as contemplated by Rule 15. Simply because an amendment may increase defendant's potential liability is insufficient to deny leave to amend. Further, this court has already determined that it has jurisdiction over plaintiffs' copyright claims. We will permit the amendment in this case, and allow defendants ten days from the date of this order to file a responsive pleading.

III. Preliminary Injunction

Plaintiffs seek to enjoin defendants from three allegedly unlawful activities. First, they request that defendants cease and desist from using the Center's name to market and advertise the bust. Second, plaintiffs seek under 17 U.S.C. § 502(a) to restrain defendants from any further infringement of plaintiffs' copyrights. Third, plaintiffs seek to halt the sale and manufacture of the plastic reproductions of the image of Dr. King.
The function of a preliminary injunction is "merely to preserve the status quo until the merits of the case can be adjudicated." Morgan v. Fletcher, 518 F.2d 236, 239 (5th Cir. 1975). The court may grant plaintiffs the injunctive relief they request only if they satisfy four prerequisites by showing
(1) a substantial likelihood that plaintiff will prevail on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the injunction is not granted, (3) that the threatened injury to plaintiff outweighs the threatened harm the injunction may do to defendant, and (4) that granting the preliminary injunction will not disserve the public interest.
Id. at 239.

A. Use of the Center's Name

Defendants do not object to an injunction restraining them from using the Center's *860 name. Although defendants do not concede that their previous use of the name was unlawful, they have agreed both in their brief and at the hearing held in this matter to discontinue using the Center's name in the promotion or solicitation of orders for the busts. We will therefore grant the requested injunction on this issue.

B. Copyright Infringement

Plaintiffs allege that defendants infringed their copyrights by reproducing substantial excerpts from copyrighted speeches of Dr. King in two publicationsthe advertising Pamphlet distributed in over 80,000 copies of various black newspapers, and the Booklet distributed to purchasers of the bust. Plaintiffs claim copyright in the speeches briefly entitled "I Have a Dream," "I Have Been to the Mountaintop," "Drum Major Instinct Sermon," and "The Nobel Peace Prize Acceptance Speech." See Plaintiffs' Exhibit 10 and attachments. Defendants' use of this material infringes their rights under the federal law, plaintiffs contend. They request that defendants be enjoined from the infringement, and that the infringing materials be impounded during the pendency of this action and destroyed. 17 U.S.C. §§ 502, 503.
Pursuant to section 502(a) of the Copyright Act, 17 U.S.C. § 502(a), a preliminary injunction may be granted at the discretion of the court to restrain the further violation of the copyright in issue. The question for the court is whether the movant has shown a substantial likelihood of success on the merits, and a sufficient likelihood of immediate irreparable injury. An injunction may issue even if the defendant asserts a plausible defense. See, e. g., Dallas Cowboys Cheerleaders v. Scoreboard Posters, Inc., 600 F.2d 1184 (5th Cir. 1979). In this case, plaintiffs have met that burden.
A review of the Pamphlet and Booklet reveals substantial quoting from Dr. King's protected speeches.[3] Defendants do not challenge plaintiffs' copyright to the speeches. The only defense they assert is that of "fair use." 17 U.S.C. § 107. The statute permits the use of copyrighted materials in very limited circumstances. The "fair use" provision, section 107, provides in pertinent part:
Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include
(1) The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
(2) The nature of the copyrighted work;

*861 (3) The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
(4) The effect of the use upon the potential market for or value of the copyrighted work.
The determination of whether a use is "fair" within the meaning of the statute is essentially a factual inquiry. There is no set formula. Although the fact that a use of a work is for commercial gain will not automatically preclude a finding of "fair use", generally fair use will be more readily recognized where the defendant's use is for educational, historical, or scientific purposes.
Defendants claim that their use of the copyrighted materials is a "fair use" even though the use was that of commercial exploitation. They rely primarily on New York Times Co. v. Roxbury Data Interface, Inc., 434 F.Supp. 217 (D.N.J.1977), where the court held that plaintiffs were not entitled to preliminarily enjoin the defendants from publishing a name index to the plaintiffs' copyrighted "New York Times Index." The court found that, unlike the instant case, the plaintiffs did not have a copyright in the material (the names) actually copied by defendants. The substance of their copyright was the correlation of data with citations to pages and columns of The New York Times. Further, although the defendants sought financial gain from the publication, the defendants' index would serve the public interest in the dissemination of information. See also Meerpol v. Nizer, 560 F.2d 1061 (2d Cir. 1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978).
Neither the facts of Roxbury nor the public interest consideration are present in this case. Defendants have copied the actual copyrighted material for no purpose but their own financial gain. Defendants' use of substantial passages from Dr. King's creative works was purely to induce consumers to buy the plastic busts and to convey the impression that the Center approved of the product. This is not a "fair use." See, e. g., Amana Refrigeration, Inc. v. Consumers Union of United States, Inc., 431 F.Supp. 324 (N.D.Iowa 1977). See also Key Maps, Inc. v. Pruitt, 470 F.Supp. 33, 38 (S.D.Tex.1978) ("fair use" presupposes good faith and fair dealing). We must conclude, looking at the evidence presented and the guidelines enumerated in section 107, that defendants' defense of "fair use" fails.
One final argument defendants assert is that plaintiffs have not shown sufficient irreparable injury for an injunction to issue in this case. The courts have held, however, that when it is shown that a copyright is valid and a prima facie case of infringement is made, the plaintiff is entitled to a preliminary injunction "without a detailed showing of danger of irreparable injury." King v. Mister Maestro, Inc., 224 F.Supp. 101, 108 (S.D.N.Y.1963). As it appears plaintiffs are likely to succeed on the merits, are threatened with irreparable harm from further infringement, that the threatened injury to plaintiffs outweighs the harm to defendants, and that the public interest will not be disserved, the court will order an immediate injunction against the further printing and distribution of the Pamphlet and Booklet.
Plaintiffs request, in addition, an impoundment of all infringing copies.[4]See 17 U.S.C. § 503(a). The decision to impound is discretionary with the court; no standards are set out in the statute. As this court has held an evidentiary hearing and found that plaintiffs have shown a likelihood of success on the merits, we are inclined to order the impoundment of the infringing materials. We will order that the defendants deliver up to be impounded during the pendency of this action all copies of the infringing Pamphlets and Booklets in defendants' possession or control, as well as any plates or other means for printing the infringing materials that may also be in defendants' possession or control.

C. The Bust of Dr. King

The question of whether defendants can be preliminarily enjoined from reproducing *862 the image of Dr. King for commercial purposes raises an issue of first impression in Georgia.[5] Plaintiffs contend, first, that the "right of publicity," or the right of a person to exploit his name and likeness for commercial purposes and to prevent others from doing so, is a recognized right in Georgia. Second, they contend that this right is an inheritable property right that descended to the Estate on Dr. King's death. Defendants vigorously assert that the plaintiffs have no right to enjoin the manufacture and sale of the busts.
There are four disparate torts encompassed in the right to privacy and recognized in Georgia: (1) the intrusion upon the plaintiff's seclusion, solitude, or private affairs, (2) public disclosure of private facts about the plaintiff, (3) publicity which places plaintiff in a false light, and (4) appropriation of the plaintiff's name or likeness for the defendant's advantage. Cabaniss v. Hipsley, 114 Ga.App. 367, 151 S.E.2d 496 (1967), citing W. Prosser, Handbook of the Law of Torts, 802-14 (4th ed. 1971). These four recognized torts include both injuries to the person and injuries to a person's property.
Where the harm is "based on an invasion of the plaintiff's privacy in the traditional sense," as in an injury to a person's "feelings, sensibilities, or reputation" the tort is a personal one. McQueen v. Wilson, 117 Ga.App. 488, 490, 161 S.E.2d 63, 66, rev'd on other grounds, 224 Ga. 420, 162 S.E.2d 313 (1968). See Pavesich v. New England Life Insurance Co., 122 Ga. 190, 50 S.E. 68 (1904). The first three torts listed above fall into this category.
Several states have recognized, however, that the "right of publicity," while analogous to the right of privacy, in fact protects a different interest and should be separated from the other three privacy rights. The misappropriation of a person's name or likeness for commercial exploitation is generally considered to involve a pecuniary loss, rather than a personal injury. The "right of publicity" is therefore a compensable interference with a person's proprietary interest in his own identity. New York, for example, has recognized that
[I]n addition to and independent of that right of privacy ... a man has a right in the publicity value of his photograph, i. e. the right to grant the exclusive privilege of publishing his picture .... Whether it be labelled a "property" right is immaterial; for here, as often elsewhere, the tag "property" simply symbolizes the fact that courts enforce a claim which has pecuniary worth.
Haelan Laboratories, Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866, 868 (2d Cir.), cert. denied, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953). See, e. g., Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 566, 97 S.Ct. 2849, 2852, 53 L.Ed.2d 965 (1977) (Ohio); Motschenbacher v. R. J. Reynolds Tobacco Co., 498 F.2d 821 (9th Cir. 1974) (California); Cepeda v. Swift & Co., 415 F.2d 1205 (8th Cir. 1969) (Missouri); Uhlaender v. Henricksen, 316 F.Supp. 1277 (D.Minn.1970) (Minnesota).
The "right of publicity" has also been recognized in Georgia as a property right. Where a person appropriates the plaintiff's image or name for financial gain, the injury constitutes an invasion of a property interest. "[T]he unauthorized reproduction and sale of the plaintiff's pictures for the financial gain of the defendant is an actionable tort independent of elements of injury to the person...." McQueen v. Wilson, 117 Ga.App. at 491-92, 161 S.E.2d at 66. A person has a property right in the commercial value of his name, likeness, and public personality.
Defendants argue, however, that because he was a public figure, Dr. King waived any "right of publicity." Although persons who seek publicity or public office, for example, waive some right to privacy by submitting their lives to scrutiny "for the purpose of determining whether it *863 is to the interest of those whose patronage they seek to place their interests in their hands," Pavesich v. New England Life, 122 Ga. at 200, 50 S.E. 68, the "right of publicity" at issue in this case is distinct from the right to personal privacy. It is on this rightthe exclusive right of Dr. King and arguably his heirs as wellto exploit his name and likeness for commercial gain on which plaintiffs rest their arguments. Defendants cite no authority for the proposition that a famous person, by virtue of his notoriety, waives all right to protect the commercial exploitation of his name and image. The cases cited by defendants are, in fact, to the contrary. Any waiver that may be implied when a person seeks public acclaim applies essentially only to newsworthy public comment or disclosures of legitimate public interest. See, e. g., id.; Peay v. Curtis Publishing Co., 78 F.Supp. 305 (D.D.C.1948). Dr. King did not waive his "right of publicity" by virtue of his celebrity.
The difficult issue for resolution by the court, then, is whether the property right Dr. King may have had in his lifetime to exploit his name and likeness descended to his Estate on his death. Under the prevailing authority, the traditional right of privacy is a personal right that lapses with the death of the person whose right was invaded. See, e. g., Cordell v. Detective Publications, Inc., 419 F.2d 989 (6th Cir. 1969), and cases cited therein. See also, W. Prosser at 814-15; Waters v. Fleetwood, 212 Ga. 161, 168, 91 S.E.2d 344, 348 (1956) ("relational" right to privacy in Georgia is open question);[6]Pavesich v. New England Life, 122 Ga. at 209-10, 50 S.E. 68. Recently, however, some courts have begun to treat the "right of publicity," because it is a property right, as inheritable and assignable in certain circumstances.
This court is handicapped by the dearth of law in Georgia on the question of the transferability of the right of publicity. The issue is a novel one in Georgia; there are no cases on point. Plaintiffs argue simply and straightforwardly that because the "right of publicity" is a property right recognized in Georgia, see Ga.Code § 85-101 et seq., and the state law provides for the title of a decedent's property to vest in his heirs upon death, see Ga.Code § 113-901, the Estate of Dr. King inherited the exclusive right to exploit his name and likeness and to bring an action in tort for any injury to that property. See Ga.Code § 3-505. This argument, however, elevates form over substance. The fact that the common law may recognize that an individual's commercial use of his identity during his lifetime is a protectable property right does not automatically and coincidentally invest that right with devisability. The "right of publicity" is a fairly new property right, with many unique and abstract characteristics. Because Georgia law provides little direction on the question of the devisability of this right, we must look to the law of other jurisdictions, as we believe the courts of Georgia would do, for assistance.
The cases that have addressed the issue are split. The dialogue that has developed in the courts on the issue centers on whether and how the property right to publicity arose in the decedent. Several federal courts, in applying state law, have held that the exploitation of the right of publicity during a person's lifetime is necessary to preserve the right in that person's heirs. In at least one state, New York, there is authority for the proposition that the right survives death even if the person never exercised the economic opportunity of exploiting his name and likeness before his death. See, e. g., Price v. Hal Roach Studios, 400 F.Supp. 836 (S.D.N.Y.1975) (exploitation not necessary to preserve right on death). This holding has recently been called into question, however. See Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d 215, *864 221-222 n.11. (2d Cir. 1978) cert. denied, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979) (because right was exploited during celebrity's lifetime, court "need not" decide whether right would survive celebrity's death if not so exploited); Hicks v. Casablanca Records, 464 F.Supp. 426 (S.D.N.Y. 1978) (interest survives only if exploited during lifetime).
Other courts have found that even if the right was exercised during the celebrity's lifetime, it does not survive the death of its owner as a matter of law. The California Supreme Court has held that the right to exploit one's name and likeness is personal and can only be exercised by the celebrity during his lifetime; after death the name is in the public domain. Lugosi v. Universal Pictures, 25 Cal.3d 813, 160 Cal.Rptr. 323, 603 P.2d 425 (1979). Accord Guglielmi v. Spelling-Goldberg Productions, 73 Cal. App.3d 436, 140 Cal.Rptr. 775 (1977), aff'd, 25 Cal.3d 860, 160 Cal.Rptr. 352, 603 P.2d 454 (1979). See also Maritote v. Desilu Productions, Inc., 345 F.2d 418 (7th Cir.), cert. denied, 382 U.S. 883, 86 S.Ct. 176, 15 L.Ed.2d 124 (1965). Similarly, the Sixth Circuit, in applying Tennessee law, has held that the right of publicity is not devisable.
It seems fairer and more efficient for the commercial, aesthetic, and political use of the name, memory and image of the famous to be open to all rather than to be monopolized by a few. An equal distribution of the opportunity to use the name of the dead seems preferable. The memory, name and pictures of famous individuals should be regarded as a common asset to be shared, an economic opportunity available in the free market system.
Memphis Development Foundation v. Factors Etc., Inc., 616 F.2d 956, 960 (6th Cir.), cert. denied, ___ U.S. ___, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980).
Fortunately, we need not determine whether the courts of Georgia would conclude that the "right of publicity" should be given the status of a devisable right. If any rule at all emerges from the case law cited above, it is that when the right is held to be inheritable, it must have matured during the owner's lifetime through exploitation.[7] We have no reason to believe that the courts of Georgia would reach a different conclusion, and therefore hesitate to adopt a rule permitting automatic devisability regardless of exploitation. As a factual matter, we find that although Dr. King exploited his name and likeness to champion the civil rights cause he so courageously led, there is no evidence that he commercially exploited his "right of publicity" during his lifetime.
Although there is no clear indication in the cases as to the appropriate definition of "exploitation," the cases do provide a few hints. In Hicks v. Casablanca Records, 464 F.Supp. at 429, the court stated
[I]t would appear that a party claiming the right must establish that the decedent acted in such a way as to evidence his or her own recognition of the extrinsic commercial value of his or her name or likeness, and manifested that recognition in some overt manner, e. g., making an inter vivos transfer of the rights in the name ... or posing for bubble gum cards .... (citations omitted)
The court found that the decedent, Agatha Christie, established her "right of publicity" by entering into contracts during her lifetime for the use of her name in connection with books and movies. In Factors Etc., Inc. v. Pro Arts, Inc., 579 F.2d at 221-22, the court determined that during his lifetime Elvis Presley capitalized upon the marketing of merchandise bearing his name and likeness. Therefore, the right to capitalize on that name and likeness survived his death. Similarly, the facts of Price v. Hal Roach Studios, 400 F.Supp. at 841-42, reveal that during his lifetime one of the decedents, Stan Laurel, assigned the exclusive *865 right to commercially exploit the comedy team of "Laurel and Hardy" to one of the plaintiffs.
The facts of the instant case are very different. Plaintiffs tendered the affidavit of Dr. King's sister, Mrs. Christine King Farris, in support of their claim of Dr. King's commercial use of his name and likeness. Plaintiffs' Exhibit 10. Mrs. Farris attests that prior to his death, her brother
made thousands of dollars in the form of honorariums from the use of his name, likeness, literary compositions, and speeches.
The money made from [this use] went to the support of his family and his lifetime struggle for civil liberties. Dr. King's only other basic source of monies was his salary as Pastor of Ebenezer Baptist Church.
Id. at ¶¶ 4, 5. When Dr. King gave speeches, his photograph would often accompany notices or brochures announcing the speech. In addition, Dr. King apparently sold his copyrights in several speeches to Motown Records Corporation.
Dr. King's receipt of money for public appearances and writings is far from the commercial exploitation contemplated by the cases. The modest sums Dr. King received that were used to buy the necessities of life for his family and to support the civil rights movement were, in fact, "honorariums" as his sister attested. The commercial exploitation that would be required in this case to permit his heirs to enjoin any and all reproductions of Dr. King's image by third parties requires, we believe, a showing of at least some intent on Dr. King's part to capitalize on the commercial value of his name and likeness. Unlike many celebrities, Dr. King did not exploit his public personality to his commercial advantage by endorsing products or selling merchandise bearing his name or image. It was not his purpose in accepting honorariums for speeches, permitting the use of his photographs, or selling the rights to his speeches to establish his personality as a commercial commodity. We conclude that Dr. King did not commercially exploit his name and likeness during his lifetime, and that the "right of publicity" claimed by plaintiffs could not therefore descend to the estate on his death.
Plaintiffs argue that public policy in this case mandates, however, that the heirs have the exclusive right to exploit Dr. King's image. Dr. King's likeness is used throughout the Center for Social Change and in its new Freedom Hall in a manner approved by the Estate. Because of the symbolism inherent in his very likeness, and the continuing nature of his work, plaintiffs contend that the Estate should have control over the possible denigration of that image that may occur if others are permitted to sell cheap plastic replicas such as the one at issue here.
Plaintiffs find, as do and will many others, the defendants' bust of Dr. King to be tasteless, and the manner in which it was marketed to be as offensive as it is illegal. Nevertheless, we believe an opposing argument, at least equally as strong, can be made that public policy requires instead that the name and likeness of Martin Luther King, Jr. be protected as part of the public domain. Dr. King, like many presidents of the United States and other great men and women, earned and enjoyed tremendous respect, fame, and recognition during his lifetime, and his image is part of our national heritage. To remove completely his likeness from public use would, we believe, be more detrimental than the few vulgarities or improprieties that may occur from its accessibility. Because we do not find that plaintiffs have shown a likelihood of success on the merits on this issue, we will deny their motion to enjoin the manufacture and sale of the busts of Dr. King.
Plaintiffs make an alternative argument for the injunction of the manufacture and sale of the busts, however. Relying on the Georgia Deceptive Trade Practices Act, Ga. Code §§ 106-701 et seq., the False Advertising Act, Ga.Code §§ 106-501 et seq., and the Fair Business Practices Act, Ga.Code § 106-1201 et seq., plaintiffs contend that the selling of the busts combined with the allegedly intentional misleading use of the *866 Center's name and the infringement of the plaintiffs' copyrights, comprises one inseparable deceptive practice, all aspects of which should be enjoined. See Ga.Code § 106-703 (injunction of deceptive trade practices). Further, because defendants are apparently insolvent, or nearly insolvent, plaintiffs argue that their only remedy is a broad injunction on all of defendants' activities.
We cannot agree. Adequate relief will be afforded plaintiffs at this preliminary stage by enjoining the deceptive use of the Center's name and the infringement of the copyrighted materials. To assure that defendants do not further benefit from their deceptive actions, however, we will enjoin any currently uncompleted sales of the busts solicited by the advertisements in Ebony, by the Pamphlet, by any materials inserted in the packages containing the busts that were sent to purchasers, or by the letter sent by defendants to consumers explaining the delay in the mailing of the Booklet. See Plaintiffs' Exhibit 5.[8] In addition, we will order defendants in all future advertisements or solicitations for purchase of the bust to disclaim any and all connection with the Center for Social Change.
In sum, we hereby make the following order:
(1) Defendants are ENJOINED from the use of the name of the Martin Luther King, Jr. Center for Social Change, Inc. in the marketing of the busts of Dr. King, or utilizing the name in any manner or form for commercial profit.
(2) Defendants are ENJOINED from printing, selling, or distributing the Pamphlet and the Booklet.
(3) The United States Marshal is ORDERED to seize and retain the infringing materials to be delivered up by defendants, including all copies of the Pamphlet and Booklet, and plates or matrices used in their printing, currently in defendants' possession or control. The materials shall be retained in storage by the United States Marshal in the Southern District of Ohio at defendants' expense until further order of this court.
(4) In all future advertisements or solicitations for the sale of the busts, defendants are ORDERED to include a statement that the sale of the busts is not endorsed by or connected with the Martin Luther King, Jr. Center for Social Change, Inc. To this end, plaintiffs shall propose appropriate wording for the disclaimer, and seek the stipulation of defendants. Failing agreement of the parties, plaintiffs may submit the statement to the court for approval within twenty days of the date of this order.
Accordingly, defendants' motion to dismiss is DENIED. Plaintiffs' motion for leave to amend is GRANTED. Defendants are ALLOWED ten days from the date of this order to file a responsive pleading. Plaintiffs' motion for a preliminary injunction is GRANTED in part and DENIED in part as set forth in the terms of this order.
IT IS SO ORDERED.
NOTES
[1] On January 9, 1981, after this suit was filed, defendants sent a check to the Center for $167.12, representing 3% of 186 units sold to date. The check was returned, however. Defendants' Exhibit G. Defendant James E. Bolen also testified that in September 1980 he set up a trust for the benefit of the Center with the Huntington National Bank of Franklin, Ohio. The copy of the trust agreement tendered to the court is, however, unsigned and undated. Defendants' Exhibit K.
[2] The affidavit of James F. Bolen submitted by defendants attests that "B & S Sales would manufacture the bust for another company formed by my son," and that "neither B & S Sales nor [the affiant] in any capacity had any agents doing business in the State of Georgia." Affidavit of James F. Bolen, defendants' Exhibit B at 1. Despite the attempt of B & S Sales to dissociate itself from American Heritage Products, Inc., there is sufficient evidence that B & S Sales was doing business as ("d/b/a") American Heritage, and therefore both businesses are subject to the personal jurisdiction of this court. See, e. g., defendants' Exhibits, C, D.
[3] By plaintiffs' calculation, defendants reproduced twelve sentences from "I Have a Dream" in the Pamphlet and eighteen sentences from that speech in the Booklet. They reproduced eight sentences from "I Have Been to the Mountaintop" in the Pamphlet and fourteen in the Booklet. In addition, twenty-seven sentences of Dr. King's "Nobel Peace Price Acceptance Speech" are quoted in the Booklet on pages 38 and 39. Plaintiffs' Response Brief at 5-6. Defendants argue that they only reproduced eleven sentences from Dr. King's speeches in the Pamphlet. They also attest that they purchased the "rights to a book published by Universal Press," apparently referring to a similar publication entitled Martin Luther King, Jr: The Journey of a Martyr published in 1968, on which they based the Booklet. See Defendants' Exhibit A, Affidavit of James E. Bolen; Defendants' Exhibits L and I. Defendants tendered no evidence, however, that Universal Press had purchased or obtained the right to use the copyrighted material. Plaintiffs contend they did not know of the publication and never gave Universal Press the right to use the speeches. See Supplemental Affidavit of Coretta Scott King filed February 4, 1981. A defendant's ignorance that a third party has wrongfully copied from the plaintiff is not a defense to liability. See, e. g., Pye v. Mitchell, 574 F.2d 476 (9th Cir. 1978).
[4] Although plaintiffs also seek the destruction of the infringing materials as provided in 17 U.S.C. § 503(b), destruction may be ordered only as part of a final judgment or decree.
[5] We agree with the parties that the law of the State of Georgia, the place of the injury, is to be applied in this case. See, e. g., Whitaker v. Harvell-Kilgore Corp., 418 F.2d 1010 (5th Cir. 1969).
[6] There is one Georgia case, Bazemore v. Savannah Hospital, 171 Ga. 257, 155 S.E. 194 (1930), which held that the right of privacy is not personal; subsequent to a child's death, the parents retained the right to sue for invasion of that child's privacy. The Georgia Supreme Court later questioned this holding in Waters v. Fleetwood, however. 212 Ga. at 168; 91 S.E.2d at 348.
[7] As noted in the text of this order, the court has uncovered only one case, Price v. Hal Roach Studios, Inc., 400 F.Supp. 836 (S.D.N.Y. 1975), which disregards the extent to which the decedent had exploited the right of publicity during his lifetime when determining the inheritability of the right, and that ruling has subsequently been questioned. See also Factors Etc., Inc. v. Creative Card Co., 444 F.Supp. 279 (S.D.N.Y.1977).
[8] Defendant James E. Bolen testified that defendants have sold approximately 200 busts to date, and have outstanding orders for at least 23 more.